UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES M. DAILEY,

      Petitioner,

-vs-                                    Case No.  8:07–CV-1897-T-27MAP

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

      Respondent.

_____/

**ORDER**

**THIS CAUSE IS** before the Court on Petitioner James Dailey's ("Petitioner" or "Dailey")

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1). Petitioner is a Florida

prisoner under sentence of death.  He filed a memorandum in support of the petition (Dkt. 17),

Respondent filed a response in opposition to the petition (Dkt. 31), and Petitioner filed a reply (Dkt.

36).[1]  Upon consideration of each of Petitioner's claims, the Court has determined that none has merit

and that Petitioner's request for federal habeas relief (Dkt. 1) is **DENIED**.

**BACKGROUND**

Petitioner was convicted in 1987 of first-degree murder.  He was sentenced to death.  On

November 14, 1991, Petitioner's conviction was affirmed, but his sentence was reversed by the

Florida Supreme Court and remanded for resentencing.  *See Dailey v. State*, 594 So.2d 254 (Fla.

1991).  Petitioner was resentenced to death.  The Florida Supreme Court affirmed on May 25, 1995.

---

[1] Respondent previously filed a motion to dismiss the petition (Dkt. 14).  The Court granted the motion,
in part, and dismissed Grounds 5 and 7, and some of the claims raised in Grounds 1, 2, 3 and 6 (Dkt. 27).

*See Dailey v. State*, 659 So.2d 246 (Fla. 1995). The United States Supreme Court denied certiorari on January 22, 1996. *See Dailey v. Florida*, 516 U.S. 1095 (1996) [table].

Petitioner initiated state court post-conviction proceedings in April 1997. In August 2002, the state trial court denied his post-conviction motion after conducting an evidentiary hearing. On May 31, 2007, the Florida Supreme Court affirmed the denial of the post-conviction motion and denied his state petition for writ of habeas corpus. *See Dailey v. State*, 965 So.2d 38 (Fla. 2007).

Petitioner filed the instant federal habeas petition on October 18, 2007.

**FACTS**[2]

On May 5, 1985, fourteen year-old Shelly Boggio, her twin sister Stacey, and Stephanie Forsythe were hitchhiking near St. Petersburg when they were picked up by James Dailey, Jack Pearcy and Dwaine Shaw. The group went to a bar and then to Pearcy's house, where they met Gayle Bailey, Pearcy's girlfriend. Stacey and Stephanie returned home. Shelly, Bailey, Pearcy, and Dailey went to another bar and then returned to Pearcy's house about midnight. They all entered the house. Bailey went to the bathroom. When she came out of the bathroom, Shelly, Dailey, and Pearcy were gone. Shaw was at the house. Bailey did not look in Dailey's bedroom to see if he was there. Their car was gone. Bailey remained awake. Dailey and Pearcy returned to the house without Shelly several hours later at about 2:00 or 3:00 a.m. Dailey was wearing only a pair of wet pants and was carrying a bundle. The next morning, Dailey, Shaw, and Pearcy visited a self-service laundry, then told Gayle to pack because they were leaving for Miami. Bailey asked what was going on but noone explained to her why they were leaving for Miami. Shelly's nude body was found that morning

---

[2] The facts are taken from the Florida Supreme Court's opinion affirming Petitioner's conviction on direct appeal, *Dailey v. State*, 594 So.2d 254, 255-56 (Fla.1991), opinion affirming Petitioner's resentencing. *Dailey v. State*, 659 So. 2d 246, 247 (Fla. 1995), and the trial transcript.

floating in the water near Indian Rocks Beach.  She had been stabbed, strangled and drowned. Dailey and Pearcy were charged with her death.

Pearcy was convicted of first-degree murder and sentenced to life imprisonment. At Dailey's subsequent trial, three inmates from the county jail testified that Dailey had admitted the killing to them individually.  Two of the inmates also testified that Dailey had devised a plan whereby he would confess when Pearcy's case came up for appeal if Pearcy in turn would promise not to testify against him at his own trial.  Pearcy refused to testify at Dailey's trial.  Dailey presented no evidence during the guilt phase.  The jury found him guilty of first-degree murder and unanimously recommended death.

At sentencing, Dailey requested the death penalty and the court complied, finding five aggravating and no mitigating circumstances.  The Florida Supreme Court affirmed the conviction but reversed and remanded for resentencing.  On remand, the trial judge resentenced Dailey to death after finding three aggravating and numerous mitigating circumstances.

**STANDARDS OF REVIEW**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Ward v. Hall,* 592 F.3d 1144, 1155 (11th Cir. 2010); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002).  The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v.*

3

*Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002). It is not enough that the state court "got it wrong." Petitioner must show that the result of the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637.

Here, although Petitioner has not proven any constitutional errors in his underlying conviction and sentence, any arguable error was harmless based on the facts and the record. An evidentiary hearing is not required because none of Petitioner's claims turn on any unresolved issues of fact. All involve issues of law argued on the basis of the existing record.[3]

**Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires him to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

[3] The state trial court conducted an evidentiary hearing. Its findings are "presumed to be correct." (28 U.S.C. § 2254(e)(1)). There is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

would have been different." *Id.*  If a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**Procedural default**

A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also*, Henderson v. Campbell, 353 F.3d 880, 891 (11th Cir. 2003)("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Duncan v. Henry*, 513 U.S. 364 (1995)("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]'") (citation omitted).

Under the procedural default doctrine, "if the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." *Henderson*, 353 F.3d at 891 (quoting *Judd v. Haley*, 250 F.3d at 1313).

Pre-AEDPA decisions from the Supreme Court establish the framework governing procedural default in federal habeas cases.  A procedural default will only be excused in two narrow circumstances.  First, a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default.  "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).

To show "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  The petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim without a showing of cause or prejudice if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson*, 353 F.3d at 892.  This exception is available only "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson*, 353 F.3d at 892.  The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a

6

constitutional violation has resulted in the conviction of someone who is actually innocent").  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Additionally, "'to be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324).  *Schlup* requires that a petitioner show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995), *cert. denied*, 514 U.S. 1123 (1995).

**DISCUSSION**

**GROUND ONE**

MR. DAILEY WAS DENIED A FAIR GUILT PHASE TRIAL BECAUSE OF VIOLATION OF HIS RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, COMMENT AND EVIDENCE ON THE EXERCISE OF HIS RIGHT TO EXTRADITION PROTECTIONS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS, LIMITATION OF HIS RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT, AND COMMENTS ON HIS RIGHT TO REMAIN SILENT PROTECTED BY THE FIFTH AMENDMENT  (Dkt. 1 at pgs. 5-23).

In Ground One, Petitioner raises four claims:[4] (1) the trial court improperly admitted evidence of Petitioner fighting extradition from California to Florida;[5] (2) the trial court denied him his right

---

[4] Dailey's claim regarding the admission of evidence pertaining to a knife sheath, booking photograph, and inmate testimony was previously dismissed (Dkt. 27 at p. 8).

[5] Dailey alleges that this was also a violation of his Fifth and Fourteenth Amendment rights.

to confront Paul Skalnik regarding the nature of Skalnik's pending criminal charges;[6] (3) the state made improper comments regarding Dailey's right to remain silent;[7] and (4) the trial court gave an erroneous jury instruction.

**Claim #1**

In his first claim, Petitioner complains that twice during the guilt phase of his trial, the state trial court improperly allowed the jury to hear that Dailey had fought extradition from California to Florida.  Specifically, he asserts that during opening argument, the prosecutor stated that Detective Halliday had to travel to California because Dailey was fighting extradition.  Next, he asserts that during Halliday's testimony, the prosecutor questioned Halliday regarding the extradition.

In denying this claim, the Florida Supreme Court stated:

> Dailey was extradited from California to stand trial in Florida and in opening argument the prosecutor made the following comment: "Detective Halliday will indicate to you he had to go out because Mr. Dailey was fighting extradition to come back to Florida." Defense counsel unsuccessfully moved for a mistrial. During Detective Halliday's testimony, the following exchange took place:

> Prosecutor: When was Mr. Dailey arrested on that arrest warrant?

> Halliday: Mr. Dailey was arrested on that, I believe, it was in November of '85.

> Prosecutor: As a result, did you take a further part in returning him to the State of Florida?

> Halliday: Yes, in the extradition procedures, yes.

> Prosecutor: Could you explain to the jury what extradition proceedings are?

---

[6]Dailey alleges that this was also a violation of his Sixth Amendment rights.

[7]Dailey alleges that this was also a violation of his Fifth Amendment rights.

At that point, defense counsel again moved for a mistrial, which was again denied. When testimony resumed, the prosecutor stated briefly, "Okay. Detective Halliday, we were talking about the extradition before." The prosecutor then asked Halliday the reason for going to California and the detective replied that he did so in order to identify Dailey. No further mention of extradition was made.

Dailey claims that mention of his efforts to avoid extradition was irrelevant and prejudicial. The State, on the other hand, contends that the evidence was relevant to show flight and consciousness of guilt. Dailey had moved to Florida only months before the murder. The day after the murder, he fled to Miami, but then left the next day. The fact that many months later Dailey was residing in California and exercised his right to resist extradition there has no bearing on flight following the crime or consciousness of guilt. The evidence should have been excluded. Because the statements were extremely brief and the testimony undeveloped, however, we find beyond a reasonable doubt that the error did not affect the verdict. *See State v. DiGuilio*, 491 So.2d 1129, 1139 (Fla. 1986).

*Dailey v. State*, 594 So. 2d at 256 (footnote omitted).

In *Smith v. Florida*, 269 Fed. Appx. 871, 873 (11th Cir. 2008)(unpublished), the Eleventh

Circuit stated:

Under section 2254(d), a federal court may not grant habeas relief on claims that were previously adjudicated in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has held that a state court decision is "contrary to" established law if: (1) the state arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) a state court confronts facts "materially indistinguishable" from relevant Supreme Court precedent, but reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000).

A state court decision is an "unreasonable application" of clearly established law if the state court unreasonably applies controlling law, or unreasonably extends or fails to extend, a legal principle to a new context. *Id*. at 407, 120 S. Ct. at 1520.

Petitioner argues that a defendant's due process rights are violated when the state uses the

exercise of a constitutional right against the defendant at trial, as its use essentially imposes a penalty

for the exercise of the particular right.  He cites *Cuyler v. Adams*, 449 U.S. 433 (1981) to support his

contention that requesting a pretransfer extradition hearing constitutes the exercise of both a statutory

and constitutional right, since the hearing is prescribed by the Uniform Criminal Extradition Act and

protected by the due process clause of the Fifth and Fourteenth Amendments.  Petitioner also cites

*Doyle v. Ohio*, 426 U.S. 610 (1976) for the proposition that a trier of fact may not draw adverse

inferences from a defendant's exercise of a constitutional rights.  He argues that exercising his right

to fight extradition is analogous to a defendant exercising his right to remain silent and he should

not have been penalized for exercising that right.

Petitioner fails to establish that the Florida Supreme Court's rejection of this claim was

contrary to or an unreasonable application of clearly established federal law.  Petitioner cites no case

from the United States Supreme Court addressing whether a reference to a defendant's effort to

avoid extradition constitutes error mandating reversal of the defendant's conviction.  Where there

are no cases from the Supreme Court squarely addressing a particular issue or the cases fail to

provide a clear answer to the question, a state court's decision on the issue cannot be said to have

constituted an unreasonable application of "clearly established Federal law." *Wright v. Van Patten*,

552 U.S. 120, 125-26 (2008); *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).

Moreover, in *Leverett v. Spears*, 877 F.2d 921 (11th Cir. 1989), it was held:

> In reviewing habeas corpus petitions, federal courts are not empowered to correct
> erroneous evidentiary rulings of state trial courts. *Boykins v. Wainwright*, 737 F.2d
> 1539, 1543 (11th Cir.1984), *cert. denied*, 470 U.S. 1059, 105 S. Ct. 1775, 84 L. Ed.
> 2d 834 (1985). Habeas review of an evidentiary ruling of a trial judge is limited to
> ascertaining whether the error is of such a magnitude as to render the trial
> fundamentally unfair and thus violative of due process. *DeBenedictis v. Wainwright*,
> 674 F.2d 841, 843 (11th Cir.1982). The standard in determining whether the
> admission of prejudicial evidence constitutes a denial of fundamental fairness is
> whether the evidence is "material in the sense of a crucial, critical, highly significant

factor." *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir.1989) (citation omitted); *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. denied*, 429 U.S. 850, 97 S. Ct. 139, 50 L. Ed. 2d 124 (1976).

*Id*. at 925; *Anderson v. Maggio*, 555 F.2d 447, 451 (5th Cir. 1977)("The erroneous admission of prejudicial evidence can justify habeas corpus relief only if it is 'material in the sense of a crucial, critical, highly significant factor.'")(quoting *Hills v. Henderson*, *supra*).  In determining whether the improper admission of evidence was prejudicial error, a determination must be made of the probable impact of the evidence on the mind of an average jury. *See, Schneble v. Florida*, 405 U.S. 427 (1972).

Applying the reasoning of these cases, the brief references to Petitioner's extradition cannot be said to have rendered his guilt phase fundamentally unfair.  Nor was it likely to have impacted the jury.  The reference to extradition from Halliday merely provided explanatory background for his testimony.  The prosecutor did not dwell on the subject, likely because of defense counsel's objections.  While the comments may have arguably been prejudicial, when considered in light of the other evidence of Petitioner's consciousness of guilt, they were not such that one can conclude that they were crucial, critical or highly significant.

The State introduced evidence that on the same day the murder was committed, Petitioner abruptly left for Miami with Pearcy, Bailey, and Shaw. *See United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir. 1982) ("It is today universally conceded that the fact of an accused's flight . . . and related conduct, [is] admissible as evidence of consciousness of guilt, and thus of guilt itself.") (internal quotations and citations omitted).  Petitioner's abrupt departure for Miami immediately after the murder was far more compelling evidence of consciousness of guilt than fighting extradition, which most laypersons would understand is a necessary legal process for returning an

11

accused to the state to face prosecution. Moreover, the testimony of the three inmates that Petitioner

admitted having committed the murder was compelling evidence. In light of this evidence, the brief

references to Petitioner's extradition cannot be said to have been a highly significant factor and

would have had little impact on the jury's verdict.

Regardless, any claimed constitutional error arising from the comments about petitioner's

extradition was harmless beyond any reasonable doubt under *Brecht v. Abrahamson*, 507 U.S. 619

(1993). Those brief comments could not have had a "substantial and injurious effect or influence

in determining the jury's verdict." *Id*. Petitioner has not demonstrated that any claimed error resulted

in "actual prejudice." *Brecht*, 507 U.S. at 637.

The Florida Supreme Court's denial of this claim has not been shown to be contrary to or an

unreasonable application of controlling Supreme Court precedent.

**Claim #2**

In claim 2, Petitioner complains that when the state trial court restricted defense counsel from

cross-examining Skalnik about the nature of his past and pending felony theft charges, he was denied

his Sixth Amendment right to confront the witnesses against him. Petitioner asserts that at the time

of his trial, Skalnik had pending parole violations for four theft charges and two new grand theft

charges. He argues that defense counsel should have been allowed to question Skalnik regarding the

nature of the charges to show "the extent of Skalnik's moral turpitude" and "the extent of his

motivation to seek favor with the state."

The Florida Supreme found that "the refusal of the trial court to allow defense counsel to

question inmate Skalnik concerning the specifics of charges pending against him (which were

admissible to show possible bias)" was harmless error. *Dailey v. State*, 594 So. 2d at 256 n.2.

During trial, the prosecutor objected when defense counsel asked Skalnik if his crimes involved taking things from women under dishonest circumstances (Respondent's Ex. A-9 at p. 1118). The prosecutor argued that it was improper to delve into the facts of Skalnik's prior crimes (Id.). The state trial court sustained the objection, limiting defense counsel's cross examination to whether Skalnik had been convicted of a felony, the number of felony convictions he had, and whether the felonies involved honesty and integrity. (Id. at pp. 1119-20). Skalnik admitted that he had pending parole violation charges and two new grand thefts (Id. at pp. 1107-09, 1154-55). Skalnik testified that the parole violation was based on four prior theft charges and that he had been convicted of five or six felonies (Id. at pp. 1107, 1120).

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The primary purpose of the right of confrontation is to afford the opportunity for effective cross-examination. *Delaware v. Van Arsdall*, 106 S. Ct. 1431, 1435 (1986) (quoting *Davis v. Alaska*, 94 S. Ct. 1105, 1110 (1974)). Exposing a witness' possible bias or motivation in testifying is "a proper and important function of [this] constitutionally protected right." *Delaware v. Van Arsdall*, 106 S. Ct. at 1435 (quoting *Davis v. Alaska*, 94 S. Ct. at 1110). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 106 S. Ct. at 1436 (quoting *Davis v. Alaska*, 94 S. Ct. at 1111).

Not every limitation on cross-examination violates the Confrontation Clause. "The Sixth Amendment does not require unlimited inquiry into the potential bias of a witness. As long as

sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." *United States v. Lankford*, 955 F.2d 1545, 1549 n.10 (11th Cir. 1992) (internal citations and quotations marks omitted).

It is apparent from the record that the trial court did not prohibit or unduly restrict defense counsel's cross-examination of Skalnik regarding his possible bias.  Defense counsel was allowed to ask Skalnik whether he had been convicted of a felony, how many times, and whether the felonies involved honesty and integrity.  Defense counsel also cross-examined Skalnik regarding the number of times he had testified on behalf of the prosecution against other defendants and whether it was common knowledge that the State would give favorable consideration to a prisoner for testifying against another defendant.

Through his cross examination of Skalnik, defense counsel exposed relevant facts from which the jury could evaluate Skalnik's credibility and thereby created a sufficient evidentiary basis from which to argue that Skalnik's testimony was unreliable. "The sixth amendment confrontation clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witnesses' credibility." *United States v. Burke*, 738 F.2d 1225, 1227 (11th Cir. 1984) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)).

The record demonstrates that Petitioner was provided an opportunity to confront Skalnik regarding any potential bias and prejudice on his part and to explore any ulterior motives he may have had in testifying.  Petitioner was not precluded from establishing an evidentiary basis from which to argue that Skalnik had ulterior motives for testifying favorably for the prosecution.  Indeed, through his cross examination, counsel was able to establish an evidentiary basis from which the jury could infer that Skalnik was motivated to falsely implicate Petitioner in the murder, in hopes of

14

gaining favorable consideration from the State.  In sum, contrary to Petitioner's contention, he was not deprived of his right to confront and cross examine Skalnik.

Moreover, even if Petitioner's rights under the Confrontation Clause were arguably restricted, he would not be entitled to relief.  An improper denial of a defendant's opportunity to impeach a witness for bias is subject to the harmless error analysis under *Chapman v. California*, 386 U.S. 18 (1967); s*ee Delaware v. Van Arsdall*, 106 S. Ct. at 1438.

Five factors are considered in determining whether a Confrontation Clause violation is harmless error: 1) the importance of the witness' testimony to the prosecutor's case; 2) whether the testimony was cumulative; 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case. *Id.*

A review of the entire record demonstrates that the state court's denial of defense counsel's inquiry regarding the specific facts of Skalnik's pending theft charges was harmless beyond a reasonable doubt.  The State's case was strong, and Skalnik's testimony was but one aspect of the State's case against Petitioner.  Skalnik was impeached as to his motives and possible bias, sufficiently for the jury to scrutinize and assess his credibility.  Moreover, two other inmate witnesses, Dejesus and Leitner, described  Petitioner's admissions regarding the murder and having observed Petitioner passing notes to co-perpetrator Pearcy, discussing a scheme to avoid conviction.

Additionally, Bailey's testimony describing the events of the evening before the murder circumstantially implicated Petitioner in the murder.  After she realized Petitioner, Pearcy, and the victim were gone from the house, she observed Pearcy and Petitioner return to the house two to three hours later.  Petitioner's pants were wet, circumstantially connecting him to the murder, as the victim

15

had been drowned.  Later that morning, Bailey found the victim's earring in her car.  After Petitioner, Pearcy, and Shaw went to a laundry mat, they returned and began packing their bags.  Bailey was told to "pack her things" and they abruptly left for Miami without any explanation.

In light of this evidence, even if there was an arguable restriction on Petitioner's Sixth Amendment right to confront and cross examine Skalnik, the error was harmless beyond a reasonable doubt.  The Florida Supreme Court's denial of this claim was neither contrary to or an unreasonable application of clearly established Supreme Court law.

**Claim #3**

In claim 3, Petitioner contends that during closing argument, the prosecutor commented twice on his Fifth Amendment right to remain silent.  Petitioner raised this claim on direct appeal (Respondent's Ex. A-14).  In denying this claim, the Florida Supreme Court held:

> During the trial, Dailey did not take the stand. The prosecutor made the following statement in closing argument:
>
>> Now, there are only three people who know exactly what happened on that Loop area . . . . Shelly Boggio and she is dead; Jack Pearcy and he is not available to testify; and the Defendant.  So, when the defense stands up here, as they have already and I imagine Mr. Andringa will when he gets up to rebut, and says where's the evidence, where's the eyewitnesses, use your common sense. Murderers of young girls don't commit the crime, don't sexually assault and commit a crime of murder with an audience.
>
> The prosecutor also made the following statement:
>
>> Fingernails. You didn't here [sic] about the length of Mr. Dailey's fingernails. No, because he left Pinellas County, went to Miami, where he stayed less than 24 hours and we arrest him months later in the State of California. That's right. Only he knows the length of his fingernails.
>
> Dailey claims that these statements constitute impermissible comments on his

16

right to remain silent. The State counters that they were fair rebuttal to defense charges that the State had produced little evidence.

A comment is impermissible if it is "fairly susceptible" of being viewed by the jury as referring to a defendant's failure to testify. *DiGuilio*, 491 So.2d at 1131. In *State v. Marshall*, 476 So.2d 150 (Fla. 1985), the prosecutor commented to the jury:

> Ladies and gentlemen, the only person you heard from in this courtroom with regard to the events on November 9, 1981, was Brenda Scavone [the victim].

*Id*. at 151. There, we ruled that the prosecutor's comments impermissibly highlighted the defendant's decision not to testify. *Id*. at 153. We find the present comments virtually indistinguishible [sic] and similarly impermissible. However, in light of other substantial evidence of guilt, we find beyond a reasonable doubt that the error did not affect the verdict. *DiGuilio*.

*Dailey v. State*, 594 So. 2d 257-58.

"The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify." *United States v. Muscatell*, 42 F.3d 627, 631-32 (11th Cir. 1995) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).  A prosecutor's comment violates a defendant's Fifth Amendment rights if one of two things are proven: that the prosecutor manifestly intended to comment on the accused failure to testify, or that the comment was of such a nature that the jury would "naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Bright,* 630 F.2d 804, 825 (5th Cir. 1980) ; *United States v. Watson*, 866 F.2d 381, 386 (11th Cir. 1989).

With all due respect to the Florida Supreme Court's construction of the prosecutor's comments, the record does not support a conclusion that the prosecutor "manifestly intended" to comment on his decision not to testify or that the jury would naturally and necessarily take the comments as a comment on Petitioner's failure to testify.  For that reason, this claim has no merit.

17

To the extent that the first comment could be construed, as did the Florida Supreme Court, as an indirect comment on Petitioner's failure to testify, the comment was invited by defense counsel's argument concerning the lack of witnesses to the murder (Respondent's Ex. A-10 at pp. 1230-40).  As for the second comment, it was made in fair response to the defense argument that the State had failed to produce evidence indicating that Petitioner's fingernails could leave scratch marks on the victim (Id. at p. 1233). *See United States v. Chirinos*, 112 F.3d 1089, 1099 (11th Cir.1997) ("This court will not find that a prosecutor manifestly intended to comment on a defendant's failure to testify if some other explanation for the prosecutor's remark is equally plausible.").  In this case, the comments were invited argument, rather than an intentional comment of Petitioner's failure to testify.

As for whether the jury would have naturally and necessarily taken the challenged remarks as comments on Petitioner's failure to testify depends on the context in which they were made.  "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so."  *United States v. Knowles*, 66 F.3d 1146, 1163 (11th Cir. 1995) (citation omitted) (emphasis in original).  "The comment[s] must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement." *Id*.

With respect to the prosecutor's comment regarding Petitioner's fingernails, the prosecutor did not comment, directly or indirectly, on his decision not to testify or present evidence.  The argument was in direct response to defense counsel's argument that "[y]ou heard no testimony whatsoever from the State as far as Mr. Dailey having fingernails, Mr. Dailey having nails that would scratch a victim."  (Respondent's Ex. A-10 at p. 1233).

18

The argument was obviously intended to counter defense counsel's argument addressed to the sufficiency of the State's evidence and explain why evidence regarding Petitioner's fingernails could not have been presented.  When "taken in context it [was] an objective evaluation of the state of the evidence." *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir. 1984).  In the context of defense counsel's challenge to the sufficiency of the evidence, the jury would not *necessarily* have construed the prosecutor's remark as a comment on Petitioner's failure to testify.

With respect to the prosecutor's comment that only the victim, Pearcy, and Dailey "know exactly what happened.. ," the comment was not intended to direct the jury's attention to Petitioner's failure to testify, but to counter defense counsel's argument that "none of the witnesses said anything about James Dailey having involvement in the death of [the victim]" (Respondent's Ex. A-10 at p. 1234).  The comment  was obviously made in anticipation of defense counsel's argument that there were no eyewitnesses to the murder (Respondent's Ex. A-10 at pp. 1260-61).

Moreover, considered in its proper context, the comment immediately preceded the comment "[m]urderers . . . don't sexually assault and commit a crime of murder with an audience" (Id. at p. 1261).  It was implicitly intended to support the argument that a crime may be proven with circumstantial evidence, and that "[a] well connected chain of circumstances is as conclusive in proving a crime or a fact as is positive evidence, your eyewitness." (Id. at pp. 1261-62).  Likewise, "taken in context it [was] an objective evaluation of the state of the evidence." *Solomon* , 735 F.2d at 401.  The jury would not necessarily have construed this remark as a comment on the failure to testify.

In sum, a review of the record confirms, and Petitioner has not demonstrated to the contrary, that the complained of remarks were not manifestly intended as comments on Petitioner's failure to

testify, as there is an equally plausible explanation for them. *United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992).("No manifest intent exists where another, equally plausible explanation for the remark is present.").[8]

Even if the comments were arguably improper, when considered in the context of the entire proceeding, they were not such that the trial was rendered fundamentally unfair.  There is no reasonable probability that these two comments changed the outcome of the case, considering the strength of the State's case. *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997), *cert. denied*, 523 U.S. 1080 (1998); *Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995)(establishing the two-part test for prosecutorial misconduct: the conduct must be improper and the conduct must prejudicially affect the substantial rights of the defendant, i.e., that there is a reasonable probability that, but for the conduct, the outcome of the trial would have been different), *cert. denied*, 516 U.S. 1124 (1996).

Although this Court takes issue with the Florida Supreme Court as to whether the prosecutor's argument constituted a unconstitutional comment on Petitioner's failure to testify or present evidence, the Florida Supreme Court's harmless error determination was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented.

---

[8] Moreover,  the jury was instructed:

Defendant not testifying.  The Constitution requires the State to prove its accusations against defendant.  It is not necessary for the defendant to disprove anything.  Nor is the defendant required to prove his innocence.  It is up to the State to prove the defendant's guilt by evidence.

The defendant exercised a fundamental right by choosing not to be a witness in this case.  You must not view this as an admission of guilt or be influenced in any way by his decision.  No juror should ever be concerned that the defendant did or did not take the witness stand to give testimony in the case. (Respondent's Ex. A-10 at p. 1311).

The harmless error doctrine applies to comments on an accused's right to silence. *United States v. Guerra*, 293 F.3d 1279, 1289 (11th Cir. 2002), *cert. denied*, 537 U.S. 1141 (2003)("The 'constitutional harmless error' standard applies to review of a denial of a motion for mistrial on the basis of an alleged violation of Fifth Amendment Right against self-incrimination.");*United States v. Pena*, 897 F.2d 1075, 1082 (11th Cir. 1990), *abrogation on other grounds recognized*, *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994), *cert. denied*, 514 U.S. 1086 (1995). "This analysis "requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Pena*, 897 F.2d at 1082.

The Florida Supreme Court applied this analysis in denying this claim. Its decision was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence presented.

**Claim #4**

In claim 4, Petitioner complains that he was denied a fair trial and due process because the trial court instructed the jury on the law of principals, Florida Standard Jury Instruction (Criminal) 3.01.[9] Petitioner objected to the last sentence in the instruction: "To be a principal, the defendant does not have to be present when the crime is committed." He argued that no theory of the evidence or argument supported the instruction (Respondent's Ex. A-9 at pp. 1213-14).

---

[9]The instruction read as follows:

If two or more persons help each other commit or attempt to commit a crime and the defendant is one of them, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if the defendant: (1) knew what was going to happen (2) intended to participate actively or by sharing in an expected benefit and, (3) actually did something by which he intended to help commit the crime. "Help" means to aid, plan or assist. To be a principal, the defendant does not have to be present when the crime is committed. (Respondent's Ex. A-10 at pp. 1305-06).

Nevertheless, the judge gave the instruction because of a concern that an argument could be made that Petitioner was not present when the victim was murdered (Id. at p. 1214).  Petitioner contends that he was denied due process because no evidence, theory, or argument supported the last sentence of the principals instruction.  He argues not only that the instruction was unnecessary, it was confusing and misleading, and allowed the jury to convict him merely because he and Pearcy had picked the girl up together.  He contends that there is a possibility that the jurors found that the evidence was insufficient to find that he was the murderer, but nevertheless voted to convict him on the principal theory.

Petitioner raised this claim on direct appeal (Respondent's Ex. A-14).  In denying this claim, the Florida Supreme Court held:

> As part of the guilt phase jury instructions, the court gave Florida Standard Jury Instruction (Criminal) 3.01 concerning principals, including the sentence: "To be a principal, the defendant does not have to be present when the crime is committed." Dailey contends this was error because no evidence was introduced showing that he was not present. As the trial court pointed out, however, it gave the complete instruction in an abundance of caution in case either side argued in closing that Dailey had not been present. The instruction is a correct statement of the law and we find no error.

*Dailey v. State*, 594 So. 2d at 257.

Petitioner's assertion that the principals jury instruction allowed the jury to convict him merely because he and Pearcy picked up the victim together without proof of each element of the offense is unpersuasive.  In pertinent part, the instruction provided: "[i]f two or more persons help each other commit or attempt to commit a crime and the defendant is one of them the defendant must be treated as if he had done all of the things the other person or persons did if the defendant . . . actually did something *by which he intended to help commit the crime*."  (Respondent's Ex. A-10 at p. 1306) (emphasis added).

Contrary to Petitioner's argument, the instruction did not allow the jury to convict without proof that he participated in the murder and intended it to occur.  The jury was instructed that before Petitioner could be found guilty of the murder as a principal, it must find that he "intended to help commit the crime."[10]  Moreover, during closing argument, defense counsel reiterated to the jury that before they could convict Petitioner as a principal, they had to believe that he "actually did something by which he intended to help commit the crime."  (Id. at pp. 1249-50).

"[F]ederal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, 'so infected the entire trial that the resulting conviction violate[d] due process.'" *Jamerson v. Sec'y for the Dep't of Corr.*, 410 F.3d 682, 688 (11th Cir. 2005) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Here, as the Florida Supreme Court observed, the instruction was a correct statement of Florida law.  Petitioner has not shown that the instruction was given in error such that it "so infected the entire trial that the resulting conviction violate[d] due process."  Accordingly, claim 4 does not warrant relief.

**Ground Two**

"MR. DAILEY WAS DEPRIVED OF A CONSTITUTIONALLY SOUND SENTENCING PROCEEDING BECAUSE OF ERRORS IN THE FIRST TRIAL AND IN THE RESENTENCING PROCEEDING RESULTING IN DEPRIVATIONS OF HIS DUE PROCESS AND EIGHTH AMENDMENT RIGHTS." (Dkt. 1 at pp. 23-37).

In Ground Two, Petitioner contends that his due process and eighth amendment rights were

---

[10] Pearson did not testify.  The instruction was therefore appropriate since the jury could reasonably have found, or, as the trial judge surmised, it could have been argued, that either Pearson or Petitioner, or both, actually murdered the victim.  The instruction would provide guidance to the jury in determining whether Petitioner could be found guilty of the crime if he assisted Pearson in carrying it out, intended it to happen, but was not shown to have actually been present when she died.

violated when:[11] 1) the denial of his motion for a new penalty phase jury trial on the ground that the original jury recommendation of death was invalid because the jury was improperly instructed on two aggravating factors which were not supported by the evidence;[12] 2) the trial judge failed to recuse himself from the resentencing proceeding; and 3) the trial judge failed to consider strong mitigating evidence.

**Claim #1**

Following the original penalty phase,[13] the trial judge found five aggravating circumstances: previous conviction of a violent felony; commission during a sexual battery; commission to avoid arrest; the murder was especially heinous, atrocious, or cruel; and the murder was committed in a cold, calculated, and premeditated manner (Respondent's Ex. A-2 at pp. 232-43).  The Florida Supreme Court found, in pertinent part, that the evidence failed to support the findings that the murder was committed to prevent a lawful arrest and was committed in a cold, calculated, and premeditated manner ("CCP").  *Dailey v. State*, 594 So. 2d at 259.  The Florida Supreme Court reversed and remanded for resentencing.[14]  *Id*.

After remand, Petitioner sought a new penalty phase trial on the grounds that the jury considered two aggravating factors (avoid arrest and CCP) which were not supported by the

[11] Dailey's claims that he was denied due process when (1) Detective Halliday was erroneously qualified as an expert in homicide investigation and sexual battery and, (2) when the trial court erroneously found that the murder was committed during an attempted sexual battery were previously dismissed (Dkt. 27 at p. 9).

[12] Dailey's claim that the jury recommendation of death was invalid and he was entitled to a new penalty phase trial before a new jury because the jury was given a vague instruction on the HAC aggravator was previously dismissed (Dkt. 27 at pp. 12-13).

[13] By a 12-0 vote, the jury recommended the trial court impose the death penalty (Respondent's Ex. A-2 at p. 156).

[14] The Florida Supreme Court also found that the trial court committed error when it failed to give any weight to mitigating circumstances and by considering evidence from co-perpetrator Pearcy's trial.  *Id*.

evidence, and that the jury instruction on the heinous, atrocious, or cruel aggravator ("HAC") was unconstitutionally vague (Respondent's Ex. B-2 at pp. 207-09).  The motion was denied (Id. at pp. 214-16).  Petitioner asserts that his rights to due process and to be free from cruel and unusual punishment were violated when the state trial court, having denied his motion for a new penalty phase trial, relied on the original jury's death recommendation.[15]

Petitioner raised this claim on direct appeal from his resentence. In denying this claim, the Florida Supreme Court held, in pertinent part:

> Dailey's first claim asserts that the jury recommendation of death was invalid and he was entitled to an entire new penalty phase trial before a new jury for two reasons: First, the original jury was given vague instructions on three aggravating circumstances (HAC, avoid arrest, and CCP); and second, the jury was instructed on two aggravating circumstances (avoid arrest and CCP) that were unsupported by the evidence and later struck by this Court.

> * * *

> As to the second subpart of Dailey's initial claim, the United States Supreme Court ruled in *Sochor v. Florida*, 504 U.S. 527, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992), that a death recommendation was not presumptively invalid where one aggravating circumstance was struck on appeal and three other aggravating circumstances were approved:

>> If the jury was allowed to rely on any of two or more independent grounds, one of which is infirm, we should [not] presume  that the resulting general verdict rested on the infirm ground and must be set aside. . . . [A] jury is . . . indeed likely to disregard an option simply unsupported by evidence.

> *Sochor*, 112 S. Ct. at 2122. In the present case, although two aggravating circumstances were struck on appeal, three strong aggravating circumstances remained. We will not presume that the jury relied on the infirm aggravating circumstances in recommending death under the circumstances of this case. *See, e.g.,*

---

[15] As noted, *supra*, Petitioner's claim that he was entitled to a new penalty phase trial before a new jury  because the jury was given a vague instructions on the HAC aggravator was previously dismissed.

> *Oats v. State*, 472 So. 2d 1143 (Fla.), *cert. denied*, 474 U.S. 865, 106 S. Ct. 188, 88
> L. Ed. 2d 157 (1985) (no error where court declined to empanel penalty phase jury
> on remand where three of six aggravating circumstances were struck on appeal). We
> find no error.

*Dailey v. State*, 659 So. 2d at 247-48.

Notwithstanding the Florida Supreme Court's reliance on United States Supreme Court precedent, Petitioner maintains that it was error for the trial judge to rely on the penalty phase jury's recommendation of death.  He points out that under Florida law, the trial court is required to give great weight to a jury's sentencing recommendation. *See Espinosa v. Florida,* 505 U.S. 1079, 1082, (1992) (citing *Smith v. State*, 515 So.2d 182 (Fla. 1987), *cert. denied*, 485 U.S. 971 (1988)).  He reasons that the state court's reliance on his penalty phase jury's recommendation deprived him of due process and subjected him to cruel and unusual punishment because the jury considered and weighed the avoid arrest and CCP aggravators, which were not supported by the evidence.

The Florida Supreme Court's resolution of this issue was a correct and reasonable application of  *Sochor,* which was (and is) clearly established federal law.  The Florida Supreme Court noted, in rejecting Petitioner's contention, that "although two aggravating circumstances were struck on appeal, three strong aggravating circumstances remained."  *Dailey v. State*, 659 So. 2d at 248.  In *Sochor*, asserting an Eighth Amendment challenge, the petitioner argued that the Florida penalty phase jury considered an "invalid" aggravating factor because it was not supported by the evidence. The Supreme Court rejected this argument, finding that it was ". . . fatally flawed . . . [b]ecause the jury in Florida does not reveal the aggravating factors on which it relies, we cannot know whether this jury actually relied on the coldness factor." *Sochor v. Florida*, 504 U.S. at 538.

26

Similarly, Petitioner's argument "is fatally flawed...[b]ecause the jury in Florida does not reveal the aggravating factors on which it relies, [and therefore this Court] cannot know whether this jury actually relied on the [avoid arrest and CCP] factor[s]." *Sochor*, 504 U.S. at 538.  Petitioner's contention is therefore without merit.

To the extent that Petitioner asserts that he was entitled to a new penalty phase trial because the jury instruction on the HAC aggravator was unconstitutionally vague, the Florida Supreme Court found this claim was procedurally barred. *Dailey v. State*, 659 So. 2d at 247.  Accordingly, this claim was dismissed as procedurally defaulted (Dkt. 27 at p. 13).  Nevertheless, even if the claim is not procedurally defaulted, it is without merit.

Petitioner's jury was instructed on the HAC aggravator, an instruction later found to be unconstitutionally vague in *Espinosa v. Florida*, *supra* (determining that Florida's then-standard "heinous, atrocious and cruel" instruction was unconstitutionally vague because it listed as an aggravating circumstance conduct "especially wicked, evil, atrocious or cruel" without defining any of those terms).  (Respondent's Ex. A-11 at p. 850).

Regardless, "a state appellate court may uphold the constitutionality of a death sentence, even where it is based on an invalid or improperly defined aggravator, if the court undertakes either a reweighing of the aggravating and mitigating evidence or harmless error review." *Jennings v. McDonough*, 490 F.3d 1230, 1249 (11th Cir. 2007) (citing *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990)).  "To find an error harmless, the state court must employ the 'beyond a reasonable doubt' standard of *Chapman v. California* (citation omitted)." *Jennings*, 490 F.3d at 1249 (citing *Clemons*, 494 U.S. at 753).  In conducting harmless error review, the state court may "ask whether beyond reasonable doubt the result would have been the same had the especially heinous aggravating

27

circumstance been properly defined in the jury instructions." *Id*. (citing *Clemons*, 494 U.S. at 754).

In Petitioner's appeal, the Florida Supreme Court did not conduct harmless error review of this claim.  *See Dailey v. State*, 659 So. 2d at 247.  Notwithstanding, "harmless error review by federal courts is also appropriate when state courts have not undertaken such a review themselves." *Jennings*, 490 F.3d at 1253.  Accordingly, this Court consider whether the HAC instruction had a "substantial and injurious effect or influence" on its recommendation of death.  *Id*. (citing *Brecht v. Abrahamson*, 507 U.S. at 637-38).  Upon consideration, it did not.

In Florida, the HAC aggravator concerns whether the evidence proved that the defendant had the "intent to inflict a high degree of pain or otherwise torture the victims."  *Hamilton v. State*, 678 So. 2d 1228, 1231 (Fla. 1996).  A "key to this finding is the suffering experienced by a conscious victim."  *Jennings*, 490 F.3d at 1254.

In concluding that the murder was heinous, atrocious, or cruel, Petitioner's trial judge found:

Shelly Boggio, the victim, was brutally stabbed as she fought frantically and continuously for her life. In addition to the deep stab wounds, she suffered numerous "pricking wounds" on her breast and stomach. She was choked. She was dragged into the waterway and held under water until she drowned.

Dr. Joan Wood, the Medical Examiner, testified that Shelly Boggio suffered the most severe defensive stab wounds she had ever seen in her long career as a medical examiner. Paul Skalnick [sic], a witness during the trial, testified the defendant told him, "No matter how many times I stabbed her, she would not die."

Dr. Wood indicated that the "pricking wounds" to the victim's breast and stomach area were caused by painful piercing of the top layer of skin and occurred apart from the actual stab wounds which penetrated the victim's hands, abdomen and neck. These tormenting "pricking wounds" caused pain and suffering to the victim, in addition to the stark terror of the sexual assault.

After being stripped nude, subjected to at least attempted sexual battery, tortured with numerous "prick wounds" and severely stabbed over thirty times the victim would not die. Even though suffering excruciating pain, she fought on only to die of drowning.

28

> While still alive the defendant grabbed Shelly Boggio and threw her into the waterway. He choked her and held her head under water until she quit struggling and died. Due to the chloride concentrations in the victim's heart the Medical Examiner confirmed death by drowning. This murder was indeed a conscienceless, pitiless crime which was unnecessarily torturous to the victim. The aggravating factor that the capital felony was especially heinous, atrocious, or cruel has been proved beyond a reasonable doubt.

(Respondent's Ex. B-2 at pp. 248-49).   The trial judge's factual findings and conclusions are supported by the record.

In Florida, "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." *Rimmer v. State*, 825 So.2d 304, 327 (Fla. 2002), *cert. denied*, 537 U.S. 1034 (2002) (quoting *Brown v. State*, 721 So.2d 274 (Fla.1998)). The factor contemplates conduct such a torture or subjecting the victim to pain and prolonged suffering. 826 So. 2d at 328.   The statute listing the HAC aggravating factor provides that the killing must be "especially heinous, atrocious, or cruel." Fla. Stat. § 921.141(5)(h). "[T]his provision is designed to identify those murders that, because of their heightened depravity, deserve imposition of a death sentence. *Diaz v. State*, 860 So.2d 960, 966 (Fla. 2003), *cert. denied*, 541 U.S. 1011 (2004). As the Florida Supreme Court has reasoned,

> It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies-the conscienceless or pitiless crime which is unnecessarily torturous to the victim.  We therefore have held that for this factor to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim.

Diaz v. State,  860 So.2d at 966.

The manner in which Petitioner's victim was killed unquestionably "falls under the factual rubric designated by the HAC aggravator." *Jennings*, 490 F.3d at 1254. She did not die immediately. Her attackers subjected her to pain and prolonged suffering through multiple "prickings" and stabbings. After being repeatedly stabbed, and certainly knowing that death was imminent, this fourteen year old girl was held under water until she died, not from the multiple stab wounds but from drowning. Under these circumstances, it is "beyond reasonable doubt the result would have been the same had the especially heinous aggravating circumstance been properly defined in the jury instructions." *Id*. at 1249 (citation omitted). The HAC instruction did not have a "substantial and injurious effect or influence" on the jury's recommendation of death. *Id*. at 1253 (citation omitted).

Claim 1 is without merit.

**Claim #2**

In claim 2, Petitioner complains that he was denied due process and his rights under the eighth amendment when the trial judge failed to recuse himself from the resentencing proceeding. He asserts that "[w]hile recognizing that the case law did not automatically compel Judge Penick to recuse himself from the resentencing, the constitutional requirement of judicial neutrality, the policy favoring disqualification to avoid even the appearance of judicial bias, and the particular facts of this case required recusal." (Dkt. 1 at p. 35).

Petitioner asserts that he had a reasonable fear of judicial bias because the judge improperly considered evidence from Pearcy's trial in determining that Petitioner was more culpable than Pearcy, found unproven aggravating factors, and refused to find or weigh established mitigating factors (Id. at pp. 35-36). He argues that because his "fear of judicial bias was reasonable, the denial of the motion to disqualify...violated the due process clause[] of the Fourteenth Amendment..." (Id. at p. 36).

The Florida Supreme Court, in rejecting this claim, found:

> . . . Dailey's claim that the trial judge erred in failing to disqualify himself on remand because he had imposed death the first time around has already been rejected by this Court. *See, e.g., Engle v. Dugger*, 576 So. 2d 696 (Fla. 1991). We find no error.

*Dailey v. State*, 659 So. 2d at 248.

Petitioner essentially concedes that he has not shown the judge was actually biased, but contends that there was an appearance of bias and that he had a reasonable fear of judicial bias. Regardless of Petitioner's subjective fears, "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision." *Hendrix v. Secretary, Florida Department of Corrections*, 527 F.3d 1149 (11th Cir. 2008). Accordingly, Petitioner has not demonstrated that the Florida Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law. Claim 2 is without merit.

**Claim #3**

In claim 3, Petitioner contends that during resentencing, the trial judge failed to give due consideration to strong mitigating evidence. Specifically, he asserts that: 1) despite strong evidence to the contrary, the trial court rejected any mitigating circumstance based on his history of alcohol abuse and his consumption of alcohol and marijuana on the day of the offense; 2) the trial court ignored evidence of his propensity to try to rescue others, except for one incident where he saved a young couple from drowning, and the trial court found that incident was not mitigating; 3) the trial court ignored evidence of his potential for rehabilitation; and 4) the trial court ignored evidence of his capacity to form loving relationships.

In rejecting this claim, the Florida Supreme Court found:

> Dailey next claims that the trial court failed to find and weigh mitigating circumstances. We note, however, that the trial court's sentencing order addresses mitigating circumstances at length and explains which factors were rejected as unsupported by the evidence. The order further describes the degree of weight allocated to those factors established in the record. We find no error.

*Dailey v. State*, 659 So. 2d at 248.

The law is clearly established with respect to the consideration of mitigating factors. "[T]he Eighth and Fourteenth Amendments require that the sentencer in a capital case consider any evidence which mitigates against the imposition of the death penalty." *Glock v. Moore*, 195 F.3d 625, 637 (11th Cir. 1999) (citing *Lockett v. Ohio*, 438 U.S. 586, 608 (1978)).  A sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings v. Okla.*, 455 U.S. 104, 115 (1982)(emphasis in original).   "The sentencer…may determine the weight to be given relevant mitigating evidence. But [the sentencer] may not give it no weight by excluding such evidence from [his] consideration." *Id*. As summarized in this Circuit:

>  "[W]hile sentencing courts may not refuse to consider evidence offered in mitigation, they need not decide that the facts established by that evidence have mitigating force in the context of the case. The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight."

*Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006).  "Trial court's findings on mitigating factors are presumed to be correct*, see, e.g., Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986), and will be upheld if they are supported by the record. *See, e.g.*, 28 U.S.C. § 2254(d)." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992).

In Florida, "[e]vidence is mitigating if, in fairness or in the totality of the defendant's life or character, it may be considered as extenuating or reducing the degree of moral culpability for the

crime committed." *Spann v. State*, 857 So. 2d 845, 858 (Fla. 2003). The standard of review of a trial court's conclusion as to mitigating circumstances is: "(1) whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review . . . ; (2) whether a mitigating circumstance had been established by the evidence in a given case is a question of fact and subject to the competent, substantial evidence standard; and (3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard." *Id.* at 858-59.

With respect to Petitioner's claim that the court rejected mitigating circumstances based on alcohol and marijuana consumption on the day of the murder, Petitioner asserted in his Amended Sentencing Memorandum that his capacity to appreciate the criminality or to conform his conduct to the requirements of law may have been substantially impaired because, *inter alia*, "testimony of Oza Shaw established that the Defendant was drunk and that he was drinking heavy the night of the incident." (Id. at 231). He also asked the court to consider as a mitigating factor that the "incident occurred while the Defendant was intoxicated..." (Id. at p. 234). Finally, he asserted that "[b]ecause of the alcohol problem and the heavy drinking the night of the offense, evidence was presented that the crime for which the Defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance." (Id.)

The state court found in pertinent part that there "was no evidence presented in this trial that the defendant was substantially impaired by alcohol or drugs...[and there] is absolutely no evidence that he was intoxicated." (Id. at 250). The court also noted that

> The witnesses who testified about the defendant's appearance and condition when he returned home the night of the capital felony did not describe him as being intoxicated, under the influence of any substance or suffering from any mental or emotional condition. Fellow inmates who testified at the defendant's trial testified that defendant's recollections of the circumstances on the night of the homicide were clear and detailed, not confused or unbelievable.

(Id. at p. 252).

33

Although Shaw testified that he, Pearcy, and Petitioner had been drinking and may have smoked marijuana hours before the murder, and Stacey Boggio testified that at some point while she was in the car with Petitioner and the others that everyone was "buzzed," there was no testimony that Petitioner was intoxicated before the murder (Respondent's Ex. A-8 at pp. 417-34, Ex. A-7 at p. 909).

In Florida, "evidence of impaired capacity due to intoxication must be considered as a mitigating factor where the existence of such facts is established by evidence anywhere in the record . . . however, evidence of alcohol and marijuana consumption on the day of the murder, without more, does not compel a finding of this mitigating factor." *Brown v. State*, 721 So. 2d 274, 281 (Fla. 1998) (internal citations omitted).  Thus, the trial court did not err in rejecting the mitigator that Petitioner's capacity to appreciate the criminality of his conduct was substantially impaired.  Nor did the court err in rejecting as a non-statutory mitigator that Dailey was intoxicated at the time of the murder.[16]  It certainly did not refuse to consider this factor.

In his Amended Sentencing Memorandum, Petitioner asserted that while in the military, and following his tours of duty in Viet Nam, he developed a drinking problem for which he received treatment (Respondent's Ex. B-2 at pp. 231-32).  He asserted that "[b]ecause of the alcohol problem and the heavy drinking the night of the offense, evidence was presented that the crime for which the Defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance."  (Id. at p. 234).

---

[16]Dailey did not ask the trial court to consider his consumption of marijuana and alcohol as a non-statutory mitigator (Id. at pp. 231-35).

During the penalty phase, Petitioner's ex-wife testified that she and Petitioner were married

in 1966 and were married for approximately ten years (Respondent's Ex. A-11 at pp. 1365-67).  She

testified that when he returned from Viet Nam, he had a drinking problem and that led to their

divorce [in approximately 1976] (Id. at pp. 1370, 1374).  Richard Dollar, Petitioner's military friend

who married Petitioner's ex-wife, testified that he drank with Petitioner but could not say that he had

a drinking problem (Id. at pp. 1379-80).

The sentencing court noted that there was evidence that in past years, Petitioner suffered from

a drinking problem.  The court found, however, that there was no credible evidence that he had an

alcohol problem or that he was intoxicated  at the time of the murder:

> There was some evidence presented by the defendant that in years past, he suffered
> from a drinking problem and that this problem was exacerbated by his Air Force duty
> during the Viet Nam war.
>
> * * *
>
> However, the record is void of any creditable [sic] evidence that the defendant had
> an alcohol problem, let alone an alcohol problem directly attributable to battle stress
> or clinically labeled "Viet Nam Syndrome."
>
> * * *
>
> Again the defendant asked this court to consider that the defendant was under the
> influence of extreme mental or emotional disturbance and suffering from an alcohol
> problem as both a statutory mitigating factor and a non statutory mitigating
> circumstance.  The crux of this non-statutory mitigating factor is that the defendant's
> use of alcohol resulting from his tours in Viet Nam and over a period of time has
> taken a toll on the defendant's mind and body. In this case the defendant has not
> shown these circumstances to exist. The witnesses who testified about the
> defendant's appearance and condition when he returned home the night of the capital
> felony did not describe him as being intoxicated, under the influence of any substance
> or suffering from any mental or emotional condition.  Fellow inmates who testified
> at the defendant's trial testified that defendant's recollections of the circumstances
> on the night of the homicide were clear and detailed, not confused or unbelievable.

(Respondent's Ex. B-2 at pp. 249-52).

It is apparent that from the resentencing order that the sentencing judge considered the evidence regarding Petitioner's history of alcohol abuse, found that there was evidence that he had a drinking problem "in years past," but also found that his past alcohol problems were not mitigating in this case.  "The Constitution...does not require the sentencer to conclude that a particular fact is mitigating..." *Schwab v. Crosby*, 451 F.3d at 1329.

Similarly, the trial court gave some weight to the evidence that Petitioner was loving to his family and some weight to Petitioner's rescue of a young couple from drowning. (Respondent's Ex. B-2 at pp. 249, 251-52).  The record supports the conclusion that the trial court considered and weighed these mitigating factors.

In Florida, "[w]hen addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature." *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990) (footnote omitted).  The record demonstrates that the trial court expressly addressed each mitigating factor proposed by Dailey in his Amended Sentencing Memorandum (Respondent's Ex. B-2 at pp. 231-35, 247-53).  The court explained which factors were rejected as unsupported by the evidence and described the weight allocated to those factors established in the record (Respondent's Ex. B-2 at pp. 231-235, 247-53).  "Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors." *Atkins*, 965 F.2d at 962 (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990)).

36

Petitioner has not demonstrated that the Florida Supreme Court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

Accordingly, claim 3 does not warrant relief.

**Ground Three**

"THE LOWER COURT ERRED IN DENYING MR. DAILEY'S POST-CONVICTION CLAIM THAT HE WAS DENIED HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS, DUE TO PROSECUTORIAL MISCONDUCT, WHICH RENDERED THE OUTCOME OF HIS TRIAL UNRELIABLE. THE STATE ENCOURAGED AND PRESENTED MISLEADING EVIDENCE AND ARGUMENT TO THE JURY."  (Dkt. 1 at pp. 37-46).

In Ground Three, Petitioner contends that he was denied a fair trial when the prosecutor presented misleading evidence and improper and misleading argument to the jury.  Specifically, Petitioner asserts that during closing argument, the prosecutor: 1) misstated the presumption of innocence; 2) vouched for the credibility of Skalnik; and 3) made a false statement of fact regarding when Shaw used the payphone.  He asserts that the cumulative effect of the prosecutor's misconduct denied him a fair trial.

These claims were previously dismissed as procedurally barred in this Court's September 30, 2008 Order (Dkt. 27 at p. 14).  Respondent was inadvertently instructed, however, to respond to the merits of a claim that trial counsel was ineffective in failing to: 1) object to the prosecutor's statements concerning the presumption of innocence; and 2) object to the prosecutor's vouching for Skalnik's credibility (*see* Dkt. 27 at pp. 14-15, 17).  Although Petitioner raised these ineffective assistance of counsel claims in his state Rule 3.850 post-conviction motion (Respondent's Ex. D-1 at pp. 22, 73, 76-77), Ground Three of his federal habeas petition does not raise ineffective assistance

of counsel claims (*see* Dkt. 1 at pp. 37-45, Dkt. 17 at pp. 25-36).  Consequently, the claims he raises in Ground Three of his federal petition are subject to dismissal as procedurally barred, consistent with the Court's September 30, 2008 Order.

Petitioner appears to argue that the Florida Supreme Court's determination that his cumulative effect claim was procedurally barred was based on an unreasonable determination of the facts.  The Florida Supreme Court stated in pertinent part that "[b]ecause these [seven] claims of prosecutorial misconduct are all premised on facts in the record, they could have and should have been raised on direct appeal.  The claims are therefore procedurally barred."  *Dailey v. State*, 965 So. 2d at 45.

Petitioner correctly points out that the first grounds of alleged prosecutorial misconduct were raised in the direct appeal and held to be harmless error.  *Dailey v. State*, 594 So. 2d at 256-58.  He did not, however, raise a cumulative effect claim based on prosecutorial misconduct on direct appeal (see Respondent's Ex. A-14).  "[S]ubstantive claims of prosecutorial misconduct could and should [be] raised on direct appeal and are thus procedurally barred from consideration in a post-conviction motion." *Spencer v. State*, 842 So. 2d 52, 60 (Fla. 2003).

Petitioner has not argued or demonstrated that a cumulative effect claim based on prosecutorial misconduct is not a "substantive claim of prosecutorial misconduct."  Accordingly, his cumulative effect claim is procedurally defaulted under Florida law, and he has not shown that his default is excused by either cause, prejudice, or the fundamental miscarriage of justice exception.

To exhaust a federal constitutional claim, "a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Ward v. Hill*, 592 F.3d 1144, 1155 - 1156 (11th Cir.), *cert denied*,  131 S.Ct. 647 (2010). And "the

state court petition must make the state courts aware that the claims asserted do, in fact, raise federal constitutional issues." *Id*.; *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998)("the petitioner must make the state court aware that the claims asserted present federal constitutional issues."). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan*, 513 U.S. at 365-66. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Finally, "to exhaust state remedies, petitioners must do more than present 'the state courts only with the facts necessary to state a claim for relief' and must additionally articulate the constitutional theory serving as the basis for relief." *Henry v. Dep't of Corr.*, 197 F.3d 1361, 1366 (11th Cir. 1999) (quoting *Gray v. Netherland*, 152, 116 S. Ct. 2074, 2081 (1996)).

Petitioner did not allege a federal law basis for his "cumulative effect" claim in his state court brief (Respondent's Ex. D-10 at pp. 60-63). He argued the claim based on state law, not federal constitutional law.  Neither did he cite in conjunction with his "cumulative effect" claim a federal source of law or  state case deciding such a claim on federal grounds. If he desired to claim that the cumulative effect of prosecutorial misconduct deprived him of due process and a fair trial guaranteed by the federal Constitution, he should have raised such a contention in his state court brief. Because Petitioner did not alert the Florida Supreme Court that his claim was federal in nature, he did not satisfy the exhaustion requirement of section 2254.  Consequently, the cumulative effect claim is procedurally barred from federal review.

Accordingly, Ground Three is dismissed.

39

**Ground Four**

"THE LOWER COURT ERRED IN DENYING MR. DAILEY'S CLAIM THAT HE IS ENTITLED TO A NEW TRIAL EITHER BECAUSE THE STATE VIOLATED THE MANDATES OF GIGLIO AND KNOWINGLY PUT FORTH FALSE TESTIMONY FROM PAUL SKALNIK OR NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT PAUL SKALNIK IS AN INCREDIBLE LIAR AND HIS TESTIMONY CANNOT SUSTAIN MR.
DAILEY'S CONVICTION." (Dkt. 1 at pp. 46-53).

In Ground Four, Petitioner raises two claims: 1) the State knowingly introduce false testimony concerning whether Skalnik had been promised or offered anything in exchange for his testimony, in violation of *Giglio v. United States*, 405 U.S. 150 (1972); and, alternatively, 2) a new trial is required based on newly discovered evidence relevant to Skalnik's credibility.

1. *Giglio* claim

"To make out a valid *Giglio* claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material -- i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1208 (11th Cir. 2009) (quotation marks, alterations, and citation omitted). "[W]hen the credibility of a witness is at issue, the prosecution [] is required to disclose 'evidence of any understanding or agreement as to a future prosecution.'" *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir. 2009) (citing *Giglio*, 405 U.S. at 154-55).

After an evidentiary hearing, the Florida post-conviction court determined that Petitioner had "failed to establish that Mr. Skalnik's testimony was false, and that the prosecutor was aware of this falsity at the time." (Respondent's Ex. D-2 at p. 200). The court also determined that "the facts surrounding Mr. Skalnik's testimony and subsequent events are not consistent with the existence of an agreement between Mr. Skalnik and the State." (Id. at p. 201).

In affirming the denial of this *Giglio* claim, the Florida Supreme Court explained:

> In his second issue on appeal, Dailey claims that six documents written and signed by Paul Skalnik either: (a) establish that the State knowingly presented false testimony, in violation of *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); or (b) constitute newly discovered evidence that Skalnik testified falsely at Dailey's trial. The six documents offered by Dailey include various motions and letters written by Skalnik at least a year after Dailey's conviction. FN6 In these documents, Skalnik alleges that the State promised him favorable treatment in return for testifying against Dailey and several defendants in other trials. We discuss the *Giglio* and newly discovered evidence claims in turn.

>> FN6 The six documents are: (1) a motion to dismiss for prosecutorial misconduct, filed on August 7, 1988; (2) a motion to recuse the State Attorney's Office from prosecuting the defendant, filed on August 7, 1988; (3) a pro-se motion for discharge, filed on November 26, 1988; (4) a request for a judge to disqualify herself, filed on December 18, 1988; (5) a letter addressed to Judge Luten, dated August 20, 1988; and (6) a letter to Governor Martinez, dated August 15, 1988.

> To establish a valid claim under *Giglio*, a defendant must show that (1) some testimony at trial was false, (2) the prosecutor knew that the testimony was false, and (3) the testimony was material. *Suggs v. State*, 923 So. 2d 419, 426 (Fla. 2005). "This Court applies a mixed standard of review to *Giglio* claims, 'defer[ring] to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but review[ing] de novo the application of those facts to the law.'" *Id.* (alterations in original) (quoting *Sochor v. State*, 883 So. 2d 766 (Fla. 2004)). The documents presented at the evidentiary hearing fail the first and second prongs of *Giglio*. Skalnik's allegations, made a full year after Dailey's conviction, do not prove that he testified falsely at trial. His unsubstantiated accusations also fail to establish that the prosecutor knowingly presented false testimony. At the evidentiary hearing, Skalnik disavowed the accusations contained in the six documents and unequivocally stated that they were false. The prosecutor in Dailey's case also testified that she believed Skalnik's testimony to be truthful at the time of trial. Based on this testimony and the fact that the documents in question were unsubstantiated allegations written a full year after Dailey's trial, we affirm the denial of Dailey's *Giglio* claim.

> To succeed on a claim of newly discovered evidence, a defendant must meet two requirements: first, the evidence must not have been known by the party or counsel at the time of trial, and the defendant or defense counsel seemingly could not have known of it by the use of due diligence; second, the newly discovered evidence must be of such a type that it would probably produce an acquittal on retrial. *Melton*

41

*v. State*, 949 So.2d. 994, 1011 (Fla. 2006). For the reasons discussed above in relation to the *Giglio* claim, we also find that Dailey has failed to establish that Skalnik's letters and motions would probably produce an acquittal on retrial. Therefore, the trial court's denial of Dailey's newly discovered evidence claim was proper.

*Dailey v. State*, 965 So. 2d at 44-45.

During the evidentiary hearing, Petitioner's trial prosecutor testified  that "I believed [Skalnik's] testimony to be true and I put him on the stand.  I never offered him any deals that weren't disclosed to the defense or any [sic] open court."  (Respondent's Ex. D-3 at p. 395).  She also testified that the allegations in Skalnik's "motion to dismiss for prosectorial [sic] misconduct" that she knew: 1) that Skalnik's testimony regarding other defendants' confessions was questionable, and 2) that he was coached to say that he had not received a deal from the state in exchange for his testimony when he really had received a deal, were false (Id. at pp. 395-96).

Skalnik testified that he was never promised anything by the State Attorney's Office in exchange for his testimony (Id. at pp. 451, 455-56).  He also acknowledged that his accusation that the State promised him favorable treatment in return for testifying against Dailey was false (Id. at pp. 451-81). The Florida Supreme Court, implicitly gave credence to Skalnik's testimony:

> At the evidentiary hearing, Skalnik disavowed the accusations contained in the six documents and unequivocally stated that they were false. The prosecutor in Dailey's case also testified that she believed Skalnik's testimony to be truthful at the time of trial. Based on this testimony and the fact that the documents in question were unsubstantiated allegations written a full year after Dailey's trial, we affirm the denial of Dailey's *Giglio* claim.

*Dailey v. State*, 965 So. 2d at 45.

Likewise, the Florida Supreme Court, in addressing Petitioner's contention that Skalnik lied during trial, found that "Skalnik's allegations, made a full year after Dailey's conviction, do not prove

that he testified falsely at trial." *Dailey v. State*, 965 So. 2d at 45. Those findings are presumptively correct, and Petitioner has the burden of proving by clear and convincing evidence that the state court's findings were an unreasonable determination fo the facts. *Ward v. Hill*, 592 F.3d at 1155 - 1156 , citing 28 U.S.C. § 2254(e)(1).

Petitioner contends that Skalnik lied during the evidentiary hearing when he testified that he never read the motion to dismiss for prosecutorial misconduct before signing it, that his attorney fabricated the information, and that he fabricated the allegations in the documents because he was frustrated and angry.  Petitioner's argument, however, does not establish that the allegations in Skalnik's pleadings and letters were true, or that his trial testimony was false.

Skalnik's credibility was for the post conviction court to assess. The Florida Supreme Court found Skalnik's post conviction hearing testimony credible, and that finding is presumptively correct. *Ward v. Hill*, *supra.* Petitioner has not demonstrated by clear and convincing evidence that its finding was an unreasonable determination of the facts.

During the evidentiary hearing, Petitioner's attorney asked Skalnik: "Did they ever say the words to you that you would be taken care of when the Daily [sic] trial was finished?" (Respondent's Ex. D-4 at p. 467).   Skalnik answered: "They probably said your case will be taken care of when you are finished.   They probably did say that."  (Id.). Pointing to this testimony, Petitioner contends that the Florida post-conviction court never addressed Skalnik's statement that "he was told he would be 'taken care of...'" (Dkt. 1 at p. 50).[17]

---

[17]  Skalnik's actual words were somewhat different than what Petitioner describes, Skalnik did not state that the State Attorney's Office told him "he would be taken care."  His statement that "they probably said your case will be taken care of when you are finished" is somewhat  equivocal.  Moreover, when asked: "[t]hey probably did say you would be taken care of after the Daily [sic] case?"  Significantly, Skalnik answered "I doubt that" and unequivocally stated "[t]hey never told me that I would get a deal."  (Id. at p. 466).

The record belies Petitioner's contention.  While the state courts did not expressly address this one sentence in Skalnik's testimony, implicit in the Florida Supreme Court's factual findings is a rejection of the very premise Petitioner draws from this statement in Skalnik's testimony.  It was not necessary that each sentence of Skalnik's testimony be expressly addressed by the state court to understand its conclusion. *See United States v. $242, 484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004(en banc)(so long as judgment supported by the evidence, bankruptcy court need not make explicit findings addressing each issue).

In sum, the Florida Supreme Court's rejection of this claim has not been shown by clear and convincing evidence to have been an "unreasonable determination of the facts in light of the evidence presented." See 28 U.S.C. § 2254(d)(2). The Florida Supreme Court accurately summarized the law under *Giglio* before considering whether the State had offered Skalnik anything in exchange for his testimony. Its findings are supported by the evidence at the state post conviction hearing.[18] Petitioner has not shown that the Florida Supreme Court's analysis was contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).

Accordingly, Petitioner's *Gigilo* claim is without merit.

2. Newly discovered evidence claim

Petitioner asserts that he is entitled to a new trial because of evidence discovered after his trial. The claimed new evidence is that the State now views Skalnik as not credible.  Specifically, Petitioner asserts that during his trial prosecutor's 2003 deposition, she testified that after Skalnik

---

[18] "Although ordinarily a factual determination made by the state court is entitled to a presumption of correctness, the statutory presumption of correctness does not apply if 'such factual determination is not fairly supported by the record.'" *Id.* at 1366 (citing 28 U.S.C. § 2254(d)(8); *Thames v. Dugger*, 848 F.2d 149, 151 (11th Cir. 1988)); *McBride v. Sharpe*, 25 F.3d 962, 972 (11th Cir.), *cert. denied*, 513 U.S. 990 (1994).

made false allegations in his motions and letters in 1988, she determined not to call Skalnik as a

witness in cases after 1988 because she could not in good faith believe that he would give truthful

testimony.  Petitioner argues:

> This newly discovered evidence would probably produce an acquittal at retrial
> because the state would either be ethically bound to not use Skalnik, face informing
> the jury of the complete dissipation of his credibility, or face the defense bringing it
> out. Without star witness Skalnik's testimony, or without his credible testimony, there
> would probably be an acquittal on retrial.

(Dkt. 1 at p. 51).

> In denying this claim, the Florida Supreme Court found:

> In his second issue on appeal, Dailey claims that six documents written and signed
> by Paul Skalnik either: (a) establish that the State knowingly presented false
> testimony, in violation of *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L.
> Ed. 2d 104 (1972); or (b) constitute newly discovered evidence that Skalnik testified
> falsely at Dailey's trial. The six documents offered by Dailey include various motions
> and letters written by Skalnik at least a year after Dailey's conviction. In these
> documents, Skalnik alleges that the State promised him favorable treatment in return
> for testifying against Dailey and several defendants in other trials. We discuss the
> Giglio and newly discovered evidence claims in turn.

* * *

> To succeed on a claim of newly discovered evidence, a defendant must meet two
> requirements: first, the evidence must not have been known by the party or counsel
> at the time of trial, and the defendant or defense counsel seemingly could not have
> known of it by the use of due diligence; second, the newly discovered evidence must
> be of such a type that it would  probably produce an acquittal on retrial. *Melton v.*
> *State*, 949 So.2d. 994, 1011 (Fla. 2006). For the reasons discussed above in relation
> to the *Giglio* claim, we also find that Dailey has failed to establish that Skalnik's
> letters and motions would probably produce an acquittal on retrial. Therefore, the
> trial court's denial of Dailey's newly discovered evidence claim was proper.

*Dailey v. State*, 965 So. 2d at 44-45 (footnote omitted).

Initially, the Florida Supreme Court may have misstated the newly discovered evidence claim

Petitioner presented in his brief.  In his brief, he asserted that he was entitled to a new trial because

of newly discovered evidence, describing it as the State no longer viewing Skalnik as a credible witness after he made false allegations in 1988 (Respondent's Ex. D-10 at pp. 73-75).   He did not argue that the "six documents written and signed by Paul Skalnik...constitute newly discovered evidence that Skalnik testified falsely at Dailey's trial." *Id*. at 44.   Regardless, these documents were at the core of the prosecutor's determination not to use Skalnik as a witness in future trials.

Nonetheless, this claim is without merit.   Federal law requires that a claim of newly discovered evidence demonstrate: (1) the evidence was discovered after trial, (2) the failure to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material  and (5) the evidence is such that a new trial would probably produce a different result. *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003).   In a motion for new trial context, the failure to satisfy any of these elements is fatal to the motion. *See United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1993).

Florida law essentially mirrors the federal standard.   "The evidence must have existed but have been unknown by the trial court, the party, or counsel at the time of trial, and must not have been discoverable through the use of due diligence, and . . . the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial." *Kearse v. State*, 969 So. 2d 976, 987 (Fla. 2007) (citing *Jones v. State*, 709 So. 2d 512 (Fla. 1998)).

The prosecutor's deposition testimony, at best, establishes that she would not consider using Skalnik as a witness *after* 1988 because of the false allegations he made in 1988.   In hindsight, she would not have called him as a witness in Petitioner's case.   However, she testified that at the time of Petitioner's trial, her information was that Skalnik was a reliable witness and she believed Skalnik's testimony to be true (Respondent's Ex. D-3 at pp. 387;  395).

46

First, the prosecutor's post conviction testimony and hindsight evaluation and subjective belief as to Skalnik's credibility is not evidence. Second, whatever her determination, that decision and the documents on which it was based did not exist until 1988, well after Petitioner's trial. As such, under Florida law, it would not constitute "newly discovered evidence. *See Porter v. State,* 653 So.2d 374, 380 (Fla. 1995)("Moreover, newly discovered evidence, by its very nature, is evidence which existed but was unknown at the time of sentencing.").

Third, assuming the prosecutor's testimony is evidence, at most it constitutes impeachment material, expressly excluded as a basis for a newly discovered evidence claim in *Jernigan. See United States v. Gray*, 159 Fed. Appx. 172, 173-74 (11th Cir. 2006). As such, the prosecutor's 1988 hindsight decision on whether she considered Skalnik a credible witness at the time of Dailey's trial is immaterial.[19]  Finally, the claimed evidence is not such that a new trial would probably produce a different result, considering the other direct and circumstantial evidence of Petitioner's guilt.

Moreover, a claim of newly discovered evidence is not itself a constitutional claim, absent an independent constitutional violation occurring in the underlying state criminal case, and therefore cannot state a claim for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Even if Petitioner's claim of newly discovered evidence had some arguable merit, he has not demonstrated an independent constitutional error occurred at his trial. Petitioner has certainly not shown, or claimed, freestanding innocence. *See House v. Bell*, 547 U.S. 518, 520 (2006).

Petitioner has failed to demonstrate that the Florida Supreme Court's rejection of his claim of newly discovered evidence was either contrary to, or an unreasonable application of, clearly established federal law.  Accordingly Ground Four does not warrant relief.

---

[19] The state post-conviction court likewise found irrelevant the prosecutor's opinion that Skalnik was no longer a credible witness after he filed the motions and letters (Respondent's Ex. D-3 at p. 397).

## GROUND SIX

"MR. DAILEY'S ATTORNEY [sic] WERE INEFFECTIVE FOR FAILING TO USE PHONE RECORDS TO IMPEACH GAYLE BAILEY, FAILING TO CROSS EXAMINE MR. SKALNIK ABOUT THE FACTS AND CIRCUMSTANCES OF HIS PENDING CHARGES, FAILING TO USE NEWSPAPER ARTICLES TO IMPEACH MR. SKALNIK, AND FAILING TO CALL MR. DAILEY TO TESTIFY."  (Dkt. 1 at pp. 57-58).

The surviving contention in Ground Six is Petitioner's allegation that trial counsel were ineffective in failing to: 1) impeach Skalnik with  newspaper articles; and 2) call Dailey to testify at trial.[20]  Petitioner asserts that counsel could have used newspaper articles to show that all the information Skalnik and the other two inmate witnesses testified to was contained in the public domain by way of the newspaper article.  He also asserts that counsel should have called him to testify because his testimony at the evidentiary hearing corroborated the exculpatory evidence at trial.

### Claim #1

Petitioner asserts that defense exhibits #3 and #4, the newspaper articles, contained all of the details of the murder Skalnik, Leitner, and Dejesus testified to.[21] Petitioner essentially asserts that defense counsel were ineffective in failing  impeach Skalnik's credibility by demonstrating that he learned everything he testified to from the articles.

---

[20]  Dailey's claims that trial counsel were ineffective in failing to: 1) use phone records to impeach Bailey; and 2) cross-examine Skalnik about the circumstances surrounding his pending criminal charges were previously dismissed (Dkt. 27 at pp. 15-16).

[21]  To clarify, in Ground Six, the heading of the claim states in pertinent part that counsel was ineffective in failing to use newspaper articles to impeach Skalnik. Petitioner's argues that "[t]he record of the trial and evidentiary hearing also indicates that neither defense attorney, Andringa or Denhardt, used newspaper articles to impeach Mr. Skalnik . . ." The petition does, however, mention that "Defense exhibit # 3 and # 4 clearly demonstrate that all the information Mr. Skalnik, Mr. Leitner, and Mr. Dejesus testified about was in the public domain. Failure to utilize these articles, which were readily available, constitutes ineffective assistance of counsel under the Strickland standard."
   The claim asserts the failure of counsel to impeach Skalnik with the articles. Petitioner's counseled petition does not argue that counsel was ineffective in failing to impeach Dejesus and Leitner with the articles. That is how the Florida Supreme Court read the claim and how it will be read here.

48

In denying this claim, the Florida Supreme Court found:

> We affirm the denial of Dailey's claim concerning the failure of counsel to impeach Skalnik through the use of newspaper articles. At the evidentiary hearing, counsel explained his decision not to use the articles for impeachment. Counsel stated his belief that admitting newspaper articles into evidence often instills a sense of legitimacy with the jury about the factual accounts they contain. Counsel sought to avoid this problem by excluding the articles at trial. This was a reasonable tactical decision and Dailey has failed to demonstrate that counsel's performance was deficient.

*Dailey v. State*, 659 So. 2d at 47.

The Florida Supreme Court found that defense counsel made a tactical decision not to use the articles in cross examining Skalnik. This finding of fact is presumed correct, and Petitioner must rebut it by clear and convincing evidence. *See Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995).

During the evidentiary hearing, defense counsel explained why he did not use the newspaper articles to impeach Skalnik (Respondent's Ex. D-3 at p. 403). According to counsel, while it may have been useful for cross-examination, it was his belief that jury's lend credibility to information in the newspapers, i.e., the factual accounts they contain (Id. at pp. 403-04). The Florida Supreme Court's finding that counsel's decision not to use the articles was a matter of trial tactics is supported by the evidence.

That counsel could not independently recall weighing whether to use the articles or not to impeach Skalnik does not diminish his explanation of his general tactical reasons for not using newspaper articles in trial (Id. at p. 404). The Florida Supreme Court's factual determination that defense counsel made a tactical decision not to use the newspaper articles to impeach Skalnik is fairly supported by the record. Accordingly, the statutory presumption of correctness applies and Petitioner has failed to rebut it.

49

Even if defense counsel could not adequately explain his decision not to use the articles to impeach Skalnik's credibility in particular, this ineffective assistance claim fails because Petitioner has not demonstrated that either counsel's performance was deficient or that he was prejudiced by the claimed deficient performance.

Skalnik testified at trial that while in jail, he did not get a newspaper and very seldom watched a television (Respondent's Ex. A-9 at p. 1110). He testified that he never read any newspaper accounts or saw anything on television regarding the charges against Petitioner and Pearcy before or after meeting them (Id.). In short, there is no evidence that Skalnik ever read a newspaper article about the murder that mentioned all of the specific facts to which Skalnik testified regarding what Petitioner told him in jail. Moreover, Skalnik testified about details of the murder that were not in the articles (see Respondent's Ex. D-3 at p. 379).

Further, defense counsel thoroughly attacked Skalnik's credibility and extensively cross-examined him regarding his conversations with Petitioner (Respondent's Ex. A-9 at pp. 1117-1119). Different handling of the cross-examination of Skalnik would not probably have changed the outcome of trial. *See Routly v. Singletary*, 33 F.3d 1279, 1289 (11th Cir. 1994) (no prejudice resulted from counsel's failure to more fully explore areas of cross-examination).

Petitioner fails to show counsel's performance was deficient or that he was prejudiced as a result of the claimed deficient performance.

**Claim #2**

Petitioner contends that counsel was ineffective in failing to call him to testify at trial. He raised this as Ground 1H in his state Rule 3.850 post-conviction motion (Respondent's Ex. D-1 at pp. 33-34). There, he asserted that had he testified, he could have explained the "inherent

50

inconceivability of Paul Skalnik's testimony." (Id. at p. 33).  He also asserted that he could have

given a reasonable explanation for his actions on both the night of the murder and the following day

(Id. at pp. 33-34).

The state court conducted an evidentiary hearing on this claim. The claim was denied on the

merits:

> Mr. Dailey alleges his trial counsel was ineffective for failing to call Mr.
> Dailey to testify during his trial.  He alleges that he was willing and able to testify,
> and that had his trial counsel called him to the stand, Mr. Dailey could have rebutted
> much of the State's evidence against him.  Mr. Dailey argues that his testimony
> would have shown that Paul Skalnik's testimony was false, and would have revealed
> that it was impossible for them to have had the conversation that Mr. Skalnik alleged
> in his testimony.  Furthermore, Mr. Dailey's testimony would have provided further
> support for the argument that he stayed home when Jack Pearcy left with Shelley
> Boggio and would have also provided a reasonable explanation for why he appeared
> to return home with wet pants the morning the crime was committed.
>
> In order to obtain relief based on a claim that trial counsel interfered with a
> defendant's right to testify, the defendant must still establish both the deficient
> performance, and prejudice prongs of *Strickland*.  *Oisorio v. State*, 676 So. 2d 1363,
> 1364 (Fla. 1996).  A waiver of the right to testify does not have to be made on the
> record.  *Torres-Arboledo v. State*, 524 So. 2d 403, 410 (Fla. 1988).  Furthermore, if
> a defendant disagrees with his attorney's advice not to testify, the defendant mus
> assert his right to testify on the record in order to be entitled to relief.  *Cutter v. State*,
> 460 So. 2d 538, 539 (Fla. 2d DCA 1984), *Dukes v. State*, 633 So. 2d 104, 105 (Fla.
> 2d DCA 1994).
>
> At the evidentiary hearings held on this matter, Mr. Dailey, and his trial
> counsel Harry Andringa testified as to this issue.  Mr. Dailey testified that Mr.
> Andringa advised him not to testify because he did not find Mr. Dailey's testimony
> believable.  (See Evidentiary Hearing Transcript, dated March 19, 203, p. 39-40,
> attached).  Additionally, Mr. Dailey testified he and Mr. Andringa had discussions
> about whether he should testify, and that ultimately the decision was made that he
> should not testify. (See Evidentiary hearing Transcript, dated March 19, 2003, pp. 42-
> 43, attached).  Mr. Andringa also testified that he advised Mr. Dailey not to testify
> because the jury would not find the testimony credible, and Mr. Dailey agreed not to
> testify.  (See Evidentiary Hearing Transcript, date March 19, 203, p. 118, attached).
> Therefore, the court finds Mr. Dailey waived his right to testify during his trial.  As
> such, no relief is warranted on this ground.

(Respondent's Ex. D-2 at pp. 159-160).

On appeal, the Florida Supreme Court found:

> "[W]e reject the claim that counsel was ineffective for failing to call Dailey to testify. At the evidentiary hearing, counsel explained that Dailey's story about how his pants became wet was likely to be rejected by the jury and would damage his credibility. This was a reasonable tactical decision and we find no deficiency in counsel's performance.

*Dailey v. State*, 965 So. 2d at 47.

During the evidentiary hearing, Petitioner testified that his pants were wet because he was playing frisbee with Pearcy and went out in the water to retrieve the frisbee (Id. at pp. 308, 329). Defense counsel testified that he discussed with Petitioner whether he should testify but believed that Petitioner's story that he was playing frisbee in the early morning hours would not be credible to the jury and was not "going to serve us well." ((Respondent's Ex. D-3 at pp. 408; 408-10). Counsel was "trying to retain some credibility with the jury." (Id. at p. 411). He was concerned with the jury's "body language" during the trial, and that the defense was not being "well received" by the jury (Id. at pp. 410-11).

It is also apparent that defense counsel was concerned that if Petitioner testified during the guilt phase and was convicted, he would have very little credibility in the penalty phase (Id. at p. 409). *See Florida v. Nixon*, 543 U.S. 175, 191 (2004) (recognizing that the gravity of the potential sentence in a death penalty trial and the two-tier proceeding "vitally affects counsel's strategic calculus" when approaching a death penalty case).

The Florida Supreme Court found that defense counsel made a tactical decision not to call Dailey to testify. This finding is presumed correct absent convincing evidence to the contrary. *Jackson v. Herring*, 42 F.3d at 1367. Defense counsel's testimony during the evidentiary hearing supports this finding. Petitioner has not presented clear and convincing evidence to the contrary.

"Whether an attorney's tactical decision is a *reasonable* one...is an issue of law." *Jackson v. Herring*, 42 F.3d at 1367 (citations omitted) (emphasis in original). This Court must "give great deference to choices dictated by reasonable strategy." *Dingle v. Sec'y for the Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (citation omitted). "The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done. *Id.* (citing *Conklin v. Schofield*, 366 F. 3d 1191, 1204 (11th Cir. 2004)).

Defense counsel's advice and recommendation to Petitioner not to testify was reasonable, for the reasons he explained in the post conviction hearing. Significantly, Petitioner admitted that he made the decision not to testify (Id. at pp. 332-33). He stated, however, that he made the decision based on counsel's advice, and he was talked out of testifying by his ex-wife and mother who advised him to follow counsel's advice (Id. at pp. 328-30). This is not a claim that counsel prevented or interfered with Petitioner's right to testify.

Under the circumstances, defense counsel's tactical decision not to call Petitioner is virtually immune from post-conviction challenge. *Strickland*, 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable."); *see Conklin*, 366 F.3d 1191 at 1204 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

The Florida Supreme Court's decision that defense counsel was not ineffective is neither contrary to nor an  unreasonable application of clearly established federal law as determined by the Supreme Court, nor based on an unreasonable determination of the facts. Ground Six is without merit.

ACCORDINGLY, it is ORDERED:

1. Petitioner's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2. The Clerk is directed to enter judgment against Petitioner and close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district

court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a

certificate of appealability (COA).  (Id.).  "A [COA] may issue…only if the applicant has made a

substantial showing of the denial of a constitutional right.  § 2253(c)(2).  To make such a showing,

Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)(quoting

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve

encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003)(quoting

*Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Upon motion, the Court will consider whether

to grant a COA on a given issue.

**DONE AND ORDERED** in Tampa, Florida, on April 1, 2011.

*/s/ James D. Whittemore*

**JAMES D. WHITTEMORE**
**United States District Judge**

Copy furnished to:
Counsel of Record